Good morning and may it please the court, Javier Maldonado representing the Plaintiff This case concerns the deadly shooting of Juan Mendez by Agent Poitevent. It is an appeal from the District Court's dismissal of the Plaintiff's Bivens claim against the agent and the Plaintiff's FTCA intentional tort claims against the United States. The District Court granted summary judgment to the federal agent concluding that he was entitled to qualified immunity. As it concerns the FTCA claim, the District Court granted summary judgment to the United States based on binding precedent from the circuit discord holding that the United States may claim, on behalf of its agents, Texas law that privileges the actions of peace officers. We are appealing both claims. I hope this morning I have an opportunity to touch on several points. If I lose on your 1983 claim, does that automatically take down your federal tort claim as well? On the Bivens claim? Or just put it the other way around. If you prevail on your Bivens claim, is that tantamount to survival on your federal tort claim? I don't believe so, Your Honor, but I believe that the issue has been taken up on cert by the Supreme Court. And I don't know the name of the case. There is the judgment bar in the FTCA that states that any judgment obtained against the employee may serve to bar— I don't mean to detract from your argument. Go ahead. No, no, no. Not at all, Your Honor. I'm here to answer the Court's questions. I hope this morning I have an opportunity to discuss the following point. First, the undisputed facts viewed in the light most favorable to the non-movement, Juan Mendez family, establishes that the agent violated Mr. Mendez's Fourth Amendment rights. Was there an autopsy? I didn't see that anyplace. I saw the Texas Rangers report, but was there an autopsy? Is that in the record?  The agent shot Mr. Mendez in the back. I thought the other brief says that the Texas Rangers report showed that he was shot in the left side and the right side. He was shot somewhere under his left arm, below the ribcage, the first shot. The second shot was on his right side. I believe that was when he was falling down. If you read the declaration of the third party witness, he testified that the second shot hit him as he was going down. Is there any evidence of what angle the shot entered? I mean, did it enter sideways? In the report, Your Honor, the Texas Rangers report. The first shot. The first shot, yes. It does say it is from front to back. The shot came from front to back. I mean, from back to front. Under his... Under his... So it was going through his back to the front, not into the side. That's right. That's correct, Your Honor. And that is in the Texas Rangers report, and that is the testimony of the disinterested witness. Second, this court has made clear again and again that the determination of whether the use of deadly force is justified and it's reasonable must be made at the time of the shooting. Was the officer facing a substantial, imminent, and immediate threat to his life or the life of others at the time of the shooting? So what we have here is an individual running away from the federal agent, and then the agent, once the individual has covered 15 feet, the agent unholsters his weapon. How far do you think 15 feet is? Is it farther than between us? Oh, I'm terrible at distances, Your Honor. But I can say that if you look at the declaration from the disinterested witness, he said Mr. Mendez covered 15 feet before the agent unholstered his weapon. I'm asking, do you think it's about between the distance between you and I today, you and me? I honestly, Your Honor, I would not, I could not tell. But I would point the court to the agent's own declaration. He never really comes out and says what he saw, but we do know, you have to reconcile two things with his declarations, and in our opinion, they're irreconcilable. Either he saw Juan Mendez run away and shot him in the back, or he didn't see him at all and he just shot recklessly. It's one or the other. Either way, it was unreasonable for him to use deadly force at that time. What about the fact that he'd just been attacked by Mr. Mendez, the holster on his gun had been loosened, and he was having a concussion? Your Honor, we know, yes, that he was hit at the time, but we also know that the agent perceived Mr. Mendez running away. In this court, again and again, and most recently in this court's decision of Mason v. Lafayette, this court said, look, just because there's a struggle between a police officer and an individual, it doesn't mean that the officer has a license to use deadly weapon. Where was the baton? We don't know, Your Honor, but we do know that the federal point of it did not say that Mr. Mendez went for the baton. That is not his testimony. If we don't know where it was, was the officer required to wait until he saw Mendez reach for the baton before he shot, or was he entitled to worry that he was searching for the baton to come back and hit him? I think this court must appreciate the officer's position at the time that the struggle was happening. That's what I'm asking. Yes, Your Honor. If we don't know where the baton was, then we can assume the officer didn't know where the baton was, right? But we also know that the officer— And that the officer could reasonably have worried that Mendez was looking for or reaching for the baton to come back and hit him with. And respectfully, that may be—if the officer had said that, we would have to concede it, Your Honor. But the officer never said— The officer doesn't know where the baton is. But the officer doesn't say that Mr. Mendez went after the baton. No, he doesn't know where the baton is. All he knows is—and this is where—the way I looked at this is that your client was never trying to attack Mr. Portervoir, except when Mr. Portervoir was chasing him. He was trying to get away. He was never coming at—  Every time he would get away, he would tackle him, and that's when the fight ensued. And he would try to run again, and the fight ensued. And then whenever he finally shot him was whenever he was running away from him to try to get away and escape. But then, on the other hand, you don't know whether the officer himself may have said, Well, I mean, the only way to—because he had done this several times. I mean, he had escaped, and then the officer caught him and pulled him back. Then that's when the fights began. That this is going to be another fight, and I shot him, but I—you know, that— So the AG knew a couple of things, Your Honor, that Juan wanted to run away toward Mexico. Twice, I think, he brought him down from the fence. In fact, he took his shirt off. I think we could argue that once the shirt was off, he could— Agent Pointevent could see that there was no weapon on Mr. Juan. But putting that aside, putting that aside, the running—trying to run away and then coming back and then finally running away, this court has said at the moment of the deadly shooting, we're going to look for what's called a madness act. Did he charge the officer? Did he do a furtive movement to go for a weapon? Did he raise his hands in a way that threatened the officer? We don't have that here. We have an individual running away from the officer, and the agent perceived this. That's my question to you. Yes, Your Honor. Very fine point on it. When we don't know where the baton is, is the officer required to wait until he actually picks up the baton and threatens him with—brain dishes it or is going for it, and the officer is aware of that? Or can—is the officer entitled to say, I don't know where it was. I was worried that he might go find it. I mean that's kind of where— And that—and I believe that the circuit precedent—the precedent from the circuit requires more in the case of deadly shooting. Not a generalized threat, but something that places—precisely for that reason the test is, was the officer in substantially imminent and immediate threat of harm? I mean there would be no doubt about this case that the officer was justified or would have been justified in pulling his weapon at an earlier point in this struggle. I don't think we would be here, Your Honor. I think that's correct. I mean clearly the officer was in—was threatening the safety and the life of the officer. But at the time—we have said in an opinion actually written, and I think I was on the panel with Judge Owen, and that is that you judge the deadly force at the time that it happened, and at the time that it happened, was he in fear of his life or safety? And that's the question we have here. Whenever the man is running 15 feet before he starts unholding his gun, so you assume he's 20 feet away, can you take into context all of this other struggle that has occurred to say that his life was in danger when the man is running 15—say 20 feet away, he shoots him in the back when he's no threat to him? That's correct, Your Honor. And this court has said— Let's be precise. Yes, Your Honor. It may make a difference. Yes, Your Honor. Was he shot at 15 feet or did the officer fire at 15? Where was the body? Well, the summary judgment evidence here, the declaration from the disinterested witnesses, is that Juan Mendes covered 15 feet before the agent unholstered his weapon and shot Mr. Mendes. So he had—go ahead. Go ahead. So, I mean, I just want to make the point that the agent appreciated the fact that Mr. Mendes had his back to the agent. He appreciated that fact before he discharged his weapon. But now you say 15 feet and then he began to unholster. Is that what the record shows? That is what the record shows, Your Honor. So it would be 20 feet or maybe 5 feet away because the guy was running, trying to get away from me as fast as he could, I guess. I mean that's the impression I got. And I guess all I can say, Your Honor, at this point is that— So 20 feet away from him while he was retreating, as it were, running from me. But the evidence is 15. No, the evidence is 15 whenever he unholstered his thing. But it was loose anyway. Yes, I mean that's what we have in the record evidence right now, the declaration of Mr. Andrade where he says, Juan Mendes had covered 15 feet before the agent unholstered his weapon and shot him twice. Now, I didn't point this out in the brief, but it's in the record, Your Honor. I would direct the court's attention to page 401 of the record, which is the Texas Rangers report. And in that paragraph, paragraph 1.18 on page 401, Agent Point of End said, yes, I was hit. I was afraid. He was—I don't have it in front of me, but essentially he says, I didn't know what to do, so I shot him. And his subjective intent is irrelevant, as you know, under the law. It's what would an objectively reasonable officer or any officer do. Yes, Your Honor, I think— We're not delving into exactly what his subjective intent was at this point. And that's why his generalized fear—his statement of the generalized fear that Juan Mendes was coming back or might come back or do something is simply not credible. This is not the case of Coulson v. Barnhart where the individual knocked out two police officers and is walking— The question is not whether he believed it. The question is could any reasonable officer in his position have feared. Yes, Your Honor. That's the question. For his safety. For his safety. Not every—any reasonable officer. And I submit that any reasonable officer would not fear for his life if he's seen a fleeing felon run away from him. It is not—this court and the Supreme Court has said it is not better that we kill a fleeing felon than that he escape. Officer also said I was blacking out. Well, the statement is ambiguous, Your Honor. I was not blacked out, but I was blacking out. Well, Your Honor, I closed my eyes right now and I blacked out. I don't know what that means, but we do know that he appreciated the fact that Mr. Mendes was running away from him because he shot him in the back. Well, he shot him. Maybe he couldn't see. He was disoriented. Exactly, Your Honor. And those were the irreconcilable positions. He either appreciated the fact that Mr. Mendes was running and shot him in the back— Well, he may have seen him but not realized whether he was front or back. That's the thing. He's been hit in the head. Everybody agrees he had a concussion. He says— I don't— And there's nothing to challenge his credibility on this that he was blacking out and he shot. He didn't know what the guy was doing. Respectfully, Your Honor, that is not what his declaration says. Okay, what does it say? He says he saw black. He thought he was going to lose consciousness. He had fear. He drew his weapon and shot Mr. Mendes. I have summarized it in that sense. The declaration is fairly specific that he did not black out. I have— No, I agree. He said he was afraid he was going to. Yes, Your Honor, and the generalized fear of harm is not enough. It must be imminent and immediate harm. That is what this court requires to justify the deadly use of force against an individual. I see my time has run out. Okay, you've saved some time for rebuttal. And we will hear from the government now. Mr. Richter. May it please the Court. Zachary Richter for the United States and Taylor Poitiman. A reasonable agent facing the tense, uncertain, and rapidly evolving situation that confronted Taylor Poitiman could and would have resorted to a firearm in this situation. The suspect in this case repeatedly ignored lawful orders, shrugged off attempts to use lesser force, disarmed the agent of his baton, knocked the radio away from the agent so that he could not call for help, stood up from the ground with the agent on his back, and then turned and struck the agent in his head, concussing him and disrupting his vision. Under the totality of these circumstances, Agent Poitiman's use of force did not violate the Fourth Amendment, and it was privileged under Texas law, as the district court correctly determined. But, you know, the other side to it is that he was fleeing, you know, 15 feet, 20 feet, but somewhere in that he was running away from it. But he was never the aggressor except when he was stopped. He was always trying to get away from the officer. He had no weapon at all, and he was fleeing from the crime of what, crossing the border or? Drug trafficking. Drug trafficking. Drug trafficking. So, I mean, that, you know, it paints a very close picture, I mean, in terms of shooting. I mean, we have held specifically, I mean, that, you know, you can shoot him if he'd shot him twice, and he was running away from him, and he'd shot him twice and shot him a third time and there was no threat to him. That third time would be excessive force, and that's an opinion that we wrote in Mason v. Lafayette. Yes, Your Honor. So, I mean, it's a close question. I mean, if you, to me. Your Honor, this case is different from Mason because in this situation, if you look at the declaration of Agent Poydivant, he states that he was able to see a silhouette, and that was all he was able to perceive, and he stopped firing when he saw the silhouette go down. So, whereas in Mason, the aggressor, the suspect was on the ground at that point, and then the officer fired, in this situation, Agent Poydivant stopped firing when he saw the silhouette go down. And in those moments where he was firing, he was unable to perceive which direction the suspect was moving or what the suspect was doing. Recall that even when we're talking about 15 or 20 feet, we're talking about three or four steps by a person of Mendez's size. So we're not talking about a great distance between the agent and the suspect at that point, and the agent, who has just been concussed, recall, and who cannot see exactly what the suspect is doing, must make the decision, I'm going to unfold my weapon and fire and deal with this potentially deadly threat before me. To go to the other point that you made in your question. Before you leave the silhouette, was there evidence that what he saw as a silhouette was identified by him as the man's back or the man's front, or did he not know? He didn't know, Your Honor, and the declaration says that he saw black and then he pulled his weapon and fired and he stopped firing when the silhouette went down. So he doesn't know which direction Mendez is running and to pick up. That's a very strong point in your favor. I mean, the government's favorite, because if you shoot him in the back while he's fleeing, our cases are very unfriendly to that use of force. But if you establish that he did not know whether he was fleeing or whether he was coming at him, that's a completely different case. And that fact is undervoted in the record, Your Honor. Agent Hoitavant stated that in his declaration, and this court has consistently, in Ontiveros, in the Hathaway case, has consistently required that to disregard an agent's explanation, disregard the agent's statement about why he or she used force. There must be a well-supported suspicion of mendacity undermining the agent's credibility. That's the language from Hathaway v. Hoitavant. What does he say exactly? Does he address this, the agent, does he address it specifically, that he did not know whether it was his front or his back or whether he was coming or leaving, or is that what we are surmising from the general factual depiction? He states that he feared losing consciousness, and at that point he drew his pistol and fired in an attempt to stop the threat. He does not mention whether he could see whether the suspect was moving away. That is what I think is natural to understand from his declaration. And it's important to understand as well that there— He doesn't really say one way or the other, does he? Well, he says that his vision was disrupted, he saw black, and he couldn't tell what the suspect was doing in that moment. Did he say that? I mean, did he say that? I could not tell what he was doing? He states that he perceived Mendez as a threat who could turn his baton or his sidearm on him or bystander and would not pass on the opportunity to kill him if he was unconscious. And so my understanding of that, Your Honor, and I think the natural— is that he could not see exactly what Mendez was doing at that time, and there's no evidence to the contrary on that point. Where was the baton? Is there any evidence of where the baton was? We know it was in the general area. We know it was used because the autopsy showed that there were strikes consistent with— No, I mean, did he say, well, I knew my baton was here and he was there? I mean, is there any evidence that Mendez, point of event, knew where his baton was so that he could reel the baton in or out as a potential weapon, or he just didn't know? He didn't know, Your Honor, and we don't know exactly where the baton was at that moment. And it's important to recognize that when we judge these situations as we must from the perspective of a reasonable officer on the scene, we have to look at what the agent knew in that moment. And what the agent knew in that moment was this was a person who consistently attacked him at every step and that this person could resort to using the baton, and he didn't know whether this person could pick up the baton or— On the other hand—I'm sorry. Would you finish? Yes, thank you, Your Honor. Or importantly, whether if he lost consciousness, this person might disarm him of his weapon, which had already been loosened. So recall that when he had been concussed, he believed he was quickly going to lose consciousness or he could quickly lose consciousness. Am I correct or incorrect when I read the facts as depicted in the briefs that he was always running away from him, and it's only when the agent caught him that the fight ensued? He was trying to escape all the time, trying to run away from him all the time, and it's only when the agent caught him that the fight ensued. Is that correct or incorrect? It is correct that the suspect did try to run away from the agent several times, but this court explained in Poole v. City of Shreveport that an officer will never know when a suspect may use his weapon against him, and such escalation can occur without warning. And that's an important point to make because ultimately this agent, who believes he's about to black out, cannot gamble at risk of his life. He knew the man didn't have a weapon. We have to objectively say that he knew the man didn't have a weapon. He had no shirt on. I mean, there was no indication whatsoever that he had a weapon. He had the weapon was the officer's weapon. Now, that's true. And the baton, that's the weapon that he had. And it's like Judge Owens said, where was that baton? Was the baton in his hand? Was it on the ground? Where was it? The agent did not know whether or not Mendez might have a weapon that could be concealed, for instance, in his pants. But that's not something we expect officers to gamble on when they are in this tense, uncertain, and rapidly evolving situation. Come on, Mendez. The fact's here. I mean, they had tussled. They had tussled to the ground two or three or four times. He would have known whether he had a weapon, and there's no indication from his statements that he ever thought that the man had a weapon. Well, the critical question is what an objectively reasonable officer would think in this situation, not whether Agent Poitiment testified to that effect or not. And it is critical to understand that in these situations, to use the words of Hathaway, we don't second-guess the officers' realization of when the threat comes to fruition. So it's important to realize that we don't ask agents to gamble on whether the suspect might have a knife that he hasn't had a chance to draw or whether the suspect might have a chance to use it. Well, sticking with what's in the record, what was the possibility that if the officer did black out, that Mendez could use the baton or the officer's own weapon against the officer while he was blacked out? Well, that certainly was a risk that Agent Poitiment perceived, and he said as much exactly in his declaration that he thought that Mendez, the suspect, might use his baton against him and also his firearm against him. If he blacked out? If he blacked out, if he lost consciousness. And, of course, he doesn't know in advance that he's going to lose consciousness in the next two or three seconds. He knows that he has received a severe blow to the head that, according to the eyewitness, caused him to buckle. I mean, every eyewitness account that was presented to the court and also that is digested in the Texas Rangers report shows that this blow had a severe effect on the agent. And the medical records that are digested in the Texas Rangers report confirm that there was a concussion in the suspect. The victim was very strong. We know that. Was anything in the record about the comparative size of the agent and the victim? We have Agent Poitiment's statement that Mendez was at a size advantage, and that's the statement that we have in the record, Your Honor. Now, we don't know exactly from the record how tall Agent Poitiment was or how large he was, but he did state in his declaration, it's unrebutted, that Mendez had a size advantage. I thought there was some evidence about the size of Mendez. Yes, Your Honor. How big is Mendez or was Mendez? I believe he was 5'8", Your Honor, and approximately 178 pounds, according to the Texas Rangers report. So this is an individual who is essentially full grown, and Agent Poitiment doesn't know how old he is. No, he's strong. He knew that. He certainly did, Your Honor, because at every step during this process, this suspect showed an unusual, a preternatural level of resistance, and that was reflected in the Texas Rangers report and Agent Poitiment's declaration, and was confirmed by the toxicology report. That was the toxicology report. According to the Texas Rangers report, it showed that the suspect had ingested cocaine approximately an hour and a half before the incident. Hence the strength. I'm sorry, Your Honor? Hence the strength. Hence the struggle, Your Honor, and according to the Texas Ranger who investigated this and I believe digesting the conclusion of the medical examiner, that accounted for this very unusual level of resistance. It continued for a fairly long period of time. This was not a decision to fire was made in a split second, as it almost always is, but the struggle itself unfolded over a long time, and Agent Poitiment used many techniques to try to end this threat and end this situation. All of those were shrugged off by the suspect. How close were the bystanders to Menendez? The bystanders, I believe, were about 30 or 40 feet away behind the agent and the suspect. That is, behind the agent and the suspect as he's facing the suspect. They were not in front of the house where the struggles took place, but another house over, and they were standing at some distance from that situation. With the court's permission, I'd like to address briefly the issue of the FTCA and the issue of discovery, which have been raised by the briefs. Very quickly on the FTCA, this court's decisions in Villafranca and in Dabula clearly establish that the United States may invoke the civil defense privilege that is available to Texas peace officers under Texas law, so there should be no question about that situation. I believe the questioning started today with how the Fourth Amendment claims relate to those FTCA claims. In both situations, the standard is reasonableness, so if this court rules in each appointment's favor on the Fourth Amendment claims and judges his use of force to have been reasonable, then that would also resolve the question under the FTCA. Turning next to the issue of discovery, I wanted to briefly emphasize that this was not a situation in which the district court rushed to judgment and there was some sort of surprise. This was a case that was filed two years after the events at issue. Let me ask the question I asked counsel. If we rule in your favor on the 1983 or the Bivens claim, actually, the Bivens claim, does it automatically follow that the false claim or the tort claim fails? Yes, Your Honor, we agree with that because the standard for both is reasonableness. So does it also mean if we find in his favor that the Bivens claim survives, does that mean that the tort claim survives as well? Your Honor, I wish I could give you a better answer, but the Texas courts have not explained precisely whether the—first of all, let me say yes. I think briefly the answer to your question is yes. However, there are— Both fall or both stand? Not necessarily, Your Honor, because of the second step of qualified immunity. The Fourth Amendment standard is one of reasonable use of force. However, there are two steps to the qualified immunity inquiry. The plaintiffs have completely disclaimed any argument on the second step, which it is their burden to show, and they have thereby waived any argument as to the second step of qualified immunity. By doing that, they have essentially waived the issue of qualified immunity entirely because that second step of qualified immunity, which is critical, asks whether the law was so clearly established that no reasonable officer could have believed that the conduct at issue was constitutional. And in Fourth Amendment cases involving use of force, both this court and the Supreme Court, most recently in the Milinex v. Luna case, have emphasized that given the hazy border between acceptable and unacceptable force, that there must be a case that gives the officers very clear direction that is factually on point with the case before the court. I mean, they are resting on the firmly established principle that you can't shoot a fleeing felon who is posing no threat to the public or to you. So they don't need qualified immunity. They don't need clearly established law. That is clearly established, and that's their case. And, Your Honor, in the Milinex case that the Supreme Court decided just this term, the Supreme Court said that's not the way to formulate the clearly established inquiry. The Supreme Court said you have to look more specifically at the facts of the particular case, and here we don't have just that an officer— Well, I understand that, but I'm just saying if their case is— their case rests or falls on whether you shot a fleeing felon without justification, and that's clearly established. Then you've got to get down to specifics, and the level of generality is another matter. And those specifics are critical in this case, Your Honor, because we're not just dealing with an officer who shot somebody— I understand. I'm not arguing that. Right, and I'm not attempting to argue with you, Your Honor. I'm just attempting to make the point that you have to also consider that there was an agent who was concussed who could not see clearly exactly what this suspect was doing. But that goes to—well, not to argue on behalf of the panel, but that goes to whether the law was violated or not, not necessarily whether it's clearly established, but whether the law was violated or not. I believe it goes to both questions, Your Honor. It goes to whether there was a threat. It goes to whether there was a threat, Your Honor, and it also goes to the question of should an officer in this situation who has been concussed, who knows this pattern, should that officer have recognized that he or she could not use force in that situation. And on that question, where you're looking at a situation where the officer is unable to determine what the suspect is doing and has a fear of blacking out, which is critical, in those situations there's no case that would say the officer can't use deadly force in those instances. But to go back briefly to the question of discovery, I want to emphasize that there were two rounds of briefing in this case that were months apart. There was an initial round of briefing where all the record evidence that we presented was presented to the plaintiffs. They had an opportunity to make a showing under Rule 5060. They did not make the showing required under Rule 5060, which is that for specified reasons they could show that they could not present evidence essential to present their opposition. They have never shown that they were unable to talk to any of these eyewitnesses or gather any evidence that they were blocked from taking that step at any point. And because of that, they haven't made their showing under Rule 5060. And in addition, when you look at the Texas Rangers report, which digests all of these eyewitness accounts, and when you digest the medical records, it digests the autopsy results, when you look at that, you see that there is just no reason to believe, the district court had no reason to believe that discovery would lead to something additional in this situation that would create a genuine dispute. And because of that, the district court could not have abused its discretion in resolving this case at the earliest possible stage, which is what you're supposed to do in a qualified immunity case. The Supreme Court in this case, in this court, have said over and over again, in Hunter v. Bryant principally, that you must resolve a qualified immunity case at the earliest possible stage in litigation. I want to close by emphasizing that we understand that the death in this case was indisputably tragic, but Agent Poitavent, placed in this very difficult situation, made a decision that was reasonable. And for that reason, we believe that the judgment of the district court should be affirmed. Thank you. Okay. Thank you, Mr. Zuercher. Mr. Muldoon. Muldoon. Yes, Your Honor. A few quick points. Just to restate the fact that Agent Poitavent's declaration does not say, I lost sight of him, and I didn't see where he was going. It specifically avoids saying that. And in the agent's brief, they try to fit the case into the cases from this court where the police officer can't see what the suspect is doing. Assuming that's an open question and we don't know. It did strike me. Assuming that's an open question and a question of fact as to whether he could see or not, I thought there was undisputed evidence that he felt like he was blacking out. He didn't say he did black out, that he feared he would, and that when he was afraid that when he blacked out, that the suspect would pick up his own gun, his officer's gun or the baton, and injure him. I think what we have, Your Honor, is the agent's declaration again, which is unclear on that. And based on the fact that it is unclear on that point and it is self-serving, it has to be read in the light most favorable to my clients. And he doesn't say he blacked out. Did he say he feared he was blacking out? He was afraid, yes.  He does say that, Your Honor. That's the point. He said I was afraid I would black out. Then I was afraid that while I was blacked out, he would get my baton or my gun and shoot me. Yes, that is a self-serving statement that he makes, Your Honor, but we have to take the statement as it is, that he appreciated Mr. Mendes' back. That he appreciated that Mr. Mendes was running away from him. And he shot him, 15 feet, and he unholstered his weapon and shot him. There is no waiver of the clearly established right. You know, ever since the Supreme Court says— You didn't take any depositions in this case. No, Your Honor, we did not. And here's the history on the discovery. The cases were filed in San Antonio. They were consolidated. They were transferred to Del Rio. The magistrate judge entered an order immediately. No discoveries to be had. The parties got together. They filed a joint statement where the plaintiffs say we believe we're entitled to narrow, tailored discovery. We're entitled—at a minimum, we would have wanted to depose Agent Poitouvet. Okay, is that an issue on appeal? Yes, Your Honor. You have said you want to discover and would not discover. Yes, Your Honor. It is in the brief. So I just wanted to raise that point. In other words, that would be your fallback position. That's correct, Your Honor. That the case should be remanded for further discovery. That's correct, Your Honor. It seems to me a lot of this could be clarified and we wouldn't be speculating about what the agent said or thought or what he did and so on. That's right, Your Honor. And, in fact, in the joint statement that we submitted to the district court, we said, look, we believe we're entitled to narrow, tailored discovery. The circuit precedent from this court is that the court—we expected the court to review the pleadings and say, okay—because that's the statement from this court. Before a ruling is made on the qualified immunity, the district court will tell the parties whether discovery is to be had. We never got that. We just got the decision denied.  We requested— They denied it. Denied it. Yes, in response to the motion for summary judgment that was filed by the agent. Right. We included a request for discovery. Why didn't you move for discovery initially? Come again, Your Honor? Why didn't you move for discovery initially if you weren't satisfied with the information? Well, because there was that order from the magistrate judge saying there's no discovery. The discovery was being— Did you appeal that to the district judge? No, Your Honor. But again, the rules say we can't start discovery until we have a Rule 26-F conference that allows for discovery. The magistrate judge has told us no discovery. We asked the district court through a joint statement. We want discovery, but we— Joint statement. Just the plaintiffs or— No, it was with the government, yes, Your Honor. There is no waiver on the clearly established prong. Ever since the Supreme Court says you don't have to decide prong one and then prong two, you know, you can choose prong one and prong two, now we're caught. That's the puzzle of—not the puzzle but the anomalies of a Fourth Amendment excessive and reasonable. Because an element of a Fourth Amendment violation is reasonableness. That's right, Your Honor. And the prong of qualified immunity is reasonableness. That's correct, Your Honor. So you've got to decide one and to actually decide the violation of the Constitution. And precisely for this reason, this court in Lytle v. Bexar County, in Mason, in Cole v. Carson from last November— Judge Clement, you were a judge in that. The court very quickly says, well, this is clearly established. The use of deadly force is not justified unless—on a fleeing person, unless the threat is immediate and imminent. I have no further time, Your Honor. Okay. Thank you very much. That completes the arguments that we have on the oral argument calendar for today. So this panel will stand in recess until tomorrow morning at 9 a.m.